UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DUANE HUBEL,<br><br>    Plaintiff,<br><br>- against -<br><br>DRIVE CHASSIS TOPCO PARENT, L.P.,<br>    Defendant. | CIVIL ACTION NO.<br><br>**COMPLAINT** |

Plaintiff DUANE HUBEL (herein after referred to as "Hubel"), by and through her undersigned attorney, and files this Complaint against DRIVE CHASSIS TOPCO PARENT, L.P. (hereinafter referred to as "Parent"), and in support thereof states as follows:

## NATURE OF ACTION

1. Parent awarded Hubel certain incentive equity award units in Parent (hereinafter referred to as "Units") on or about September 6, 2019, pursuant to the Drive Chassis Topco Parent, L.P. 2019 Equity Incentive Plan Class D Unit Award Agreement (hereinafter referred to as the "Award Agreement"). Ex. A.

2. Pursuant to the Award Agreement, Parent had the right to repurchase Hubel's vested Units within one year after her separation.

3. Should Parent elect to repurchase the vested Units, the Award Agreement specifies that Parent is obligated to pay the "Fair Market Value" of the vested Units as the term is defined by the Parent's Limited Partnership Agreement.

4. While Parent gave notice of its intent to exercise its right to repurchase Hubel's vested Units on or about November 11, 2021, it refused to pay Fair Market Value for the Units.

1

5. Parent's actions constitute a breach of the Award Agreement, which is an enforceable contract between the parties.

6. Parent's breach of the contract has caused Hubel to suffer damages.

7. Plaintiff seeks monetary damages and any other equitable or other relief this Court deems just and proper.

## PARTIES, VENUE, AND JURISDICTION

8. Hubel seeks damages from Parent in excess of $75,000.

9. At all times material to the instant action, Hubel is an individual who resides in St. Johns County, Florida.

10. Hubel was employed by Direct ChassisLink, Inc. (hereinafter referred to as "DCLI") until her employment ended on November 11, 2020.

11. Parent is the indirect owner of 100% of DCLI.

12. Parent is a Delaware Limited Partnership formed under the laws of Delaware and headquartered in the State of New York.

13. Pursuant to the Award Agreement, the contract is to be interpreted under the laws of the State of Delaware.

14. This Court has personal jurisdiction over the Parties pursuant to the Award Agreement, which states that the courts of the State of New York have exclusive jurisdiction over the Parties to the Award Agreement to resolve any dispute between the Parties.

15. This Court has subject matter jurisdiction over Hubel's claims pursuant to 28 U.S.C. § 1332.

16. Venue in this Court is proper.

## STATEMENT OF FACTS

17. Hubel began her employment with DCLI on or about January 12, 2018.

18. Based on her dedication and commitment to the company, DCLI notified Hubel that she would receive Units in Parent, the company that owns 100% of the ownership interest in DCLI.

19. The Award Agreement given to Hubel provides the contractual terms applicable to the award of Parent Units.

20. Specifically, the Award Agreement states that it is intended to give Hubel "an opportunity to share in the long-term growth and value creation of the Partnership."

21. Furthermore, the Award Agreement granted Hubel a set number of Units:

| **Restricted Profits Units** | **Number (#)** |
|---|---|
| Class D-1 Units | 2,930 |
| Class D-2 Units | 4,394 |
| **Total Restricted Profits Units** | 7,324 |

22. Section 3(a) of the Award Agreement provides terms regarding the vesting of the awarded Units, specifying that:

    a. The Class D-1 Units shall vest in accordance with the following schedule: 20% of the Class D-1 Units shall vest on each of the first five (5) anniversaries of April 10, 2019 (the "Vesting Commencement Date"); provided, however, that upon the consummation of a DCLI Sale Transaction, all Class D-1 Units shall become fully vested.

    b. The Class D-2 Units shall vest only upon the consummation of a DCLI Sale Transaction to the extent provided below:

     i. 25% of the Class D-2 Units shall vest upon the consummation of a DCLI Sale Transaction if, and only if, the Investor realizes both an Investor IRR equal to at least 14% and a MOIC equal to at least 1.8x.

     ii. 100% of the Class D-2 Units shall vest upon the consummation of a DCLI Sale Transaction if, and only if, the Investor realizes an Investor IRR equal to at least 18% and MOIC equal to at least 1.8x.

     iii. Vesting of the Class D-2 Units in respect of achievement between an Investor IRR of 14% and an Investor IRR of 18% shall be linearly interpolated, subject in each case to MOIC achievement of at least 1.8x.

23. Pursuant to the vesting schedule contained in the Award Agreement, 20% of Hubel's D-1 Units, or 586 units vested on or about April 10, 2020.

24. Section 3(b) of the Award Agreement states that

> In the event of the termination of the Participant's Continuous Service by the Company without Cause or by the Participant with Good Reason, the installment of the Class D-1 Units scheduled to vest next following such termination shall become vested and exercisable as of the date of such termination with respect to the number of Class D-1 Units equal to 20% of the Class D-1 Units, multiplied by (y) a fraction, (i) the numerator of which is equal to a number of calendar days that have elapsed since the last vesting date prior to the date of termination of the Participant's Continuous Service or, if no vesting date is applicable, the Vesting Commencement Date, and (ii) the denominator of which is equal to the total number of calendar days in the applicable vesting year. Any remaining unvested portion of the Class D-1 Units shall be cancelled immediately and the Participant shall immediately forfeit any rights to the Restricted Profits Units subject to such unvested portion.

25. Hubel was terminated on November 11, 2020.

26. Because 215 of 365 days had lapsed since the first twenty percent of Hubel's D-1 Units vested, another 345 D-1 Units vested on November 11, 2020 when Hubel was terminated.

27. In total, Hubel had 931 D-1 Units vested at the time of termination.

28. Section 6(a)(i) of the Award Agreement states:

> If the Participant's service with the Partnership terminates for any reason other than for Cause, the Investor or its respective designee (as applicable, the "Purchaser") shall have the right (the "Repurchase Right"), but not the obligation, upon delivery of a notice (the "Repurchase Notice") to the Participant within twelve (12) months after the Participant's termination date, to repurchase any vested Profits Units then held by the Participant (the "Redeemed Units"). For the avoidance of doubt, as provided in Section 3(b) above, any Restricted Profits Units held by the Participant that have not vested as of the Participant's date of termination shall be forfeited to the Partnership for no consideration.

29. On November 11, 2021, Parent sent Hubel a Repurchase Notice informing her that it was exercising its right to repurchase Hubel's 931 Profits Units under section 6(a)(i) of the Award Agreement.

30. Section 6(a)(ii) of the Award Agreement states that, "[i]f the Purchaser elects to exercise the Repurchase Right, the repurchase price for Redeemed Units shall be equal to the Fair Market Value per Redeemed Unit as of the termination date."

31. The Repurchase Notice stated that Parent assigned a Fair Market Value of $0.00 per Unit to Hubel's Units.

32. While the Award Agreement does not define "Fair Market Value," Section 1 of the Award Agreement provides that, "[c]apitalized terms used but not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Plan."

33. The Award Agreement defines the "Plan" as the Drive Chassis Topco Parent, L.P. 2019 Equity Incentive Plan (hereinafter referred to as the "Plan.") Ex. B.

34. Section 2(z) of the Plan states that "'Fair Market Value' shall have the same meaning as set forth in the LP Agreement."

35. Section 2(cc) of the Plan defines "The LP Agreement" as "the Amended and Restated Agreement of Limited Partnership of Drive Chassis Topco Parent, L.P., dated April 10,

5

2019 (as may be amended, modified or restated in accordance with its terms)" (hereinafter referred to as the "LP Agreement") Ex. C.

    36.    The LP Agreement provides the following definition of "Fair Market Value:"

"Fair Market Value" means, (a) with respect to any property or assets (other than (i) cash, (ii) any Units, GP Units or any other Equity Securities of the Partnership or the General Partner, (iii) any IPO Securities or (iv) any other Equity Security which is publicly traded), the price at which such property or asset is likely to be sold in an arm's-length transaction between a willing buyer and willing seller, neither of which is a Partner or an Affiliate of a Partner or of the other, based on the then prevailing market conditions, as determined by the Board in good faith; provided, that in the case of a determination for purposes of the definition of "Return", the "Fair Market Value" shall be determined by the Valuation Firm if requested by the Apollo Partner in its sole discretion or by the EQT Partner in its sole discretion; **(b) with respect to Units, GP Units, or other Equity Securities of the Partnership or the General Partner, as applicable as of any date, the amount a holder of such interest would be entitled to receive if the assets of the Partnership or the General Partner were sold for their fair market value following which the Partnership or the General Partner were to pay all outstanding liabilities and the remaining proceeds were to be distributed to the Limited Partners in accordance with the terms of this Agreement, as determined by the Board;** provided, that in the case of a determination for purposes of the definition of "Return", the "Fair Market Value" shall be determined by the Valuation Firm if requested by the Apollo Partner in its sole discretion or by the EQT Partner in its sole discretion; in each case as of such date and taking account of such factors as reasonably deemed appropriate by the Board or the Valuation Firm (as applicable), including the classification and relative rights and privileges of such interests; provided; however, that in connection with an offer by a purchaser in a Drag-Along Sale or a Tag-Along Sale, the "Fair Market Value" of any Units, GP Units or other Equity Securities of the Partnership or the General Partner being Transferred in such Drag-Along Sale or Tag-Along Sale shall mean the value of the consideration offered by the applicable purchaser; (c) with respect to any IPO Securities, the average of the daily VWAP of all IPO Securities owned by the Apollo Partner and the EQT Partner and their respective Affiliates for the 20 Trading Days immediately following the date of the applicable Qualified IPO; and (d) with respect to any other Equity Security which is publicly traded, the average of the daily VWAP of such Equity Security for the 10 Trading Days immediately preceding the applicable date of determination of Fair Market Value. [Emphasis Added.]

## COUNT I: BREACH OF CONTRACT

37. Hubel reincorporates the allegations contained in paragraphs 1 through 36 above as if fully realleged herein.

38. Hubel and Parent were parties to an enforceable contract, which was made up of the Award Agreement, the Plan, and the LP Agreement (hereinafter collectively referred to as the "Contract").

39. Parent breached the terms of the Contract when it failed to pay Hubel for her D-1 Units at the Fair Market Value as the term is defined by the Contract.

40. As a result of Defendant's breach of the Contract, Plaintiff has been deprived of her rights under the Contract, including her right to compensation at Fair Market Value for the Units in an amount to be determined at trial, plus continuing interest from the date of the breach through the date that Parent's obligation is satisfied in full.

WHEREFORE, Hubel asks this Court to enter judgment in her favor, awarding her the Fair Market Value of her vested D-1 Units, her attorneys' fees and costs pursuant to the contract, and any other relief this Court deems just and proper.

## COUNT II: BREACH OF THE IMPLIED
## DUTY OF GOOD FAITH AND FAIR DEALING

41. Hubel reincorporates the allegations contained in paragraphs 1 through 36 above as if fully realleged herein.

42. Hubel and Parent were parties to an enforceable contract, which was made up on the Award Agreement, the Plan, and the LP Agreement (hereinafter collectively referred to as the "Contract").

43. The Contract provides the Board of Directors to conduct the valuation of Fair Market Value of the Units.

44. While the Contract may confer some discretion upon Parent in the valuation of the Units, the implied covenant requires that any such discretion be used reasonably and in good faith.

45. Parent, through its Board of Directors, acted in bad faith when it calculated the value of Hubel's D-1 Units to be $0.00.

46. As a result of Parent's breach of the implied covenant of good faith and fair dealing, Hubel has suffered damages.

47. As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has been deprived of her rights under the Agreement, including her right to compensation at Fair Market Value for the Units in an amount to be determined at trial, plus continuing interest from the date of the breach through the date that Parent's obligation is satisfied in full.

WHEREFORE, Hubel asks this Court to enter judgment in her favor, awarding her the Fair Market Value of her vested D-1 Units, her attorneys' fees and costs pursuant to the contract, and any other relief this Court deems just and proper.

Respectfully submitted this 5th day of December 2022.

**DELEGAL AND POINDEXTER, P.A.**

*/s/ T.A. "Tad" Delegal, III*
T.A. "TAD" DELEGAL, III
Florida Bar No.: 0892701
Email: tad@delegal.net
JAMES C. POINDEXTER
Florida Bar No.: 116039
Email: james@delegal.net
ALEXANDRA E. UNDERKOFLER
Florida Bar No.: 1018209
Email: alex@delegal.net
424 East Monroe Street
Jacksonville, Florida 32202
Telephone No.: (904) 633-5000
Facsimile No.: (904) 358-2850

Secondary email: office@delegal.net
*Pro Hac Vice Motions Pending*
*and*

PALMERI LAW GROUP

*/s/ Salvatore A. Palmeri*
SALVATORE A. PALMERI
Florida Bar No.: 0064418
Email: sp@palmerilawgroup.com
1200 Riverplace Blvd. Suite 902
Jacksonville, Florida 32207
Telephone No.: (904) 683-2593
*Pro Hac Vice Motion Pending*

LAW OFFICES OF GREGG A. PINTO

*/s/ Gregg A. Pinto*
GREGG A. PINTO
SDNY Bar No.: GP9765
225 Broadway, 3rd Floor
New York, New York 10007
Email: pinto@pintolawoffices.com
*Local Counsel*

Counsel for Plaintiff